IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 5, 2004 Session


## DOROTHY TUCKER v. SIERRA BUILDERS, et al.

**Appeal from the Circuit Court for Wilson County**
**No. 11593     Hon. Clara Byrd, Judge**

--------

**No. M2003-02372-COA-R3-CV - Filed April 29, 2005**

--------


**DISSENTING OPINION**


The majority's analysis of the Consumer Protection Act is just excellent, however, I respectfully disagree with the majority's opinion that All American did not violate the Act in its representations made to this plaintiff. I agree with the majority's detailed history of the TCPA and that it is much broader in scope than common-law fraud, that it must be construed liberally to protect consumers, and that the plaintiff must prove an "unfair" or "deceptive" act by the defendant. I also agree that "the essence of deception is misleading consumers by a merchant's statements, silence, or actions." I disagree with the majority's conclusion, however, that All American did not act deceptively in its dealings with Ms. Tucker, and I believe that the majority opinion overlooks certain key facts in this regard. The majority neither accords the Trial Court the presumption of correctness in its fact finding as required by Rule 13(d), nor does it defer to the Trial Court on the issue of the credibility of the witnesses.[1]

The Trial Court herein found that All American had violated subsections (b)(2), (3), and (12) of Tenn. Code Ann. § 47-18-104, which deal with "causing a likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services"; "causing a likelihood of confusion or misunderstanding as to affiliation, connection, or association with, or certification by another"; and "representing that a consumer's transaction confers or involves rights, remedies, or obligations that it does not have or involve". The majority opinion states that there were no misrepresentations made to plaintiff, thus All American cannot be held liable under any of the above subsections. The majority opinion represents that plaintiff knew that All American would not be responsible for the finishing of her home, and that she also had the option to pay more

--------

[1]The majority simply reaches conclusionary assessments of the evidence.

to have this service provided by All American but chose not to do so. The undisputed proof at trial, however, was that plaintiff was taken on a tour of the All American factory by Bob Nordaas, an All American employee (who was seemingly ever-present at Sierra's office), and plaintiff was shown finished homes and repeatedly assured that her home would be finished in like manner and would look like the homes represented there. Many assertions were made regarding "our crews" and "our homes", and at no point was plaintiff made aware that Sierra was a completely independent entity, or that All American was not warranting Sierra's "finish" work. In fact, plaintiff was told that her home would be inspected by All American upon completion and they would insure that it was "perfect".

Plaintiff testified that she was told by All American employees that her home was "turnkey" and she did not need to worry about subcontractors, because she was buying a total, complete home. Plaintiff was told that "their crews" were specially trained, and that she had to use "their crew" if she wanted to buy the house. Plaintiff was told by Mr. Groshans at the conclusion of the tour that she would never regret buying an All American home, and that if she had any problem, to give him a call and he would take care of it. Plaintiff testified that it was at this point that she became convinced to buy the home. Plaintiff testified that it was not until some months later, in her second phone conversation with Groshans after she had problems with Sierra, that Groshans told her she had bought her home from Sierra, and that All American was no longer involved.

The testimony of All American's employees bolsters plaintiff's testimony - Mr. Richards admitted that they encouraged customers to take the factory tour because they had model homes on site that were completely finished, and "we want people to see what the finished product looks like." Richards testified that the builder, not the end consumer, had the option of paying extra to have the All American crew do more finish work on the home, but that Medlin chose not to purchase that option. However, there was no proof that plaintiff was ever offered this option, despite the majority's inference to the contrary. Nordaas also testified and admitted that he was there when plaintiff took her factory tour, and did not refute any of the representations plaintiff claimed were made. Thus, there was no factual dispute that All American, through it own employees, showed plaintiff the model homes that were not finished out by Sierra, and represented to plaintiff that her home would be finished out just as nicely and that it would, indeed, be "perfect". The majority's assertion that "there is no evidence that any All American employee represented to Ms. Tucker that the quality of Sierra Builders' work would equal the quality of the construction she observed in the model houses" is not supported by the record. The undisputed evidence shows that All American's employees represented exactly that.

The unrefuted proof, and the history and proper construction of the TCPA outlined in the majority opinion, compel the conclusion that All American acted deceptively in the misrepresentations that were made to plaintiff regarding the finishing out of her home. Mr. Richards admitted that consumers were encouraged to view the model homes so they could see the "finished product" - a product which All American now claims that it does not have to provide. All American seeks to sell the home in a semi-finished state and then wash its hands of the end result, all the while

representing to consumers that their homes will be finished out similarly to the model homes on its factory lot, that All American will stand behind it, that All American will handle any problems, and that the home will ultimately be "perfect". These representations, which were never denied by All American, are clearly made to induce the consumer to buy the home. It is nonsensical at best for All American to claim that "They merely supply building components and have no control over how the homes turn out," but then admit that they encourage customers to come and tour their factory (even rewarding the customer with a $500 gift certificate toward the purchase of their home, which of course, the customer does not "purchase" from them) so that the customer can be impressed with the finished product. In this case, plaintiff testified that she would not have contracted to buy this home had it not been for the tour of the model homes and the representations made regarding the "finished product" by All American employees. After the consumer does buy the home, through the "authorized builder" which All American contracts with, then the consumer is ultimately left without recourse for these representations made by All American, who suddenly claims that the authorized builder is a separate entity and that All American is no longer involved. This practice could not be more deceptive.

The evidence also showed that the sign at the Lebanon office appears to be promoting All American Homes as distinctively as Sierra Builders, and would likely lead one to believe that the companies are affiliated, or that one sponsors another.[2] Certainly Mr. Nordaas' consistent presence at that office, coupled with his representations at the factory and his involvement in the execution of the contract, would have led plaintiff to believe that the companies were more closely affiliated, or even that All American was sponsoring Sierra. Mr. Groshans' comments regarding "our crews" and how the homes are finished out would have also led plaintiff to believe that All American had control over the builders' services and the finished product. Even Mr. Groshans' comments regarding his ability to handle problems with the builder would have led plaintiff to believe that All American was standing behind the entire project.

Construing the TCPA liberally, as this Court is required to do, there can be no question that this admitted pattern of conduct by All American clearly causes likelihood of confusion as to the certification of the finished product as described in Tenn. Code Ann. §47-18-104(b)(3). This practice further represents that the consumer has rights or remedies against All American that the consumer ultimately does not have, as described in Tenn. Code Ann. §47-18-104(b)(12), and it causes likelihood of confusion regarding the source of the finish services as described in Tenn. Code Ann. §47-18-104(b)(2). The majority opinion simply does not concur in the facts as found by the Trial Court, even though they are basically undisputed, and further fails to uphold the Trial Court's findings regarding witness credibility, which this Court is required to do. The preponderance of the evidence supports the Trial Court's conclusion that All American violated the TCPA based on the above statutory sections. *See* Tenn. R. App. P. 13(d). The Trial Court's ruling should be affirmed.

All American sought to rely upon the written contract between plaintiff and Sierra,

---

[2]Plaintiff testified that the sign on the Lebanon office said: "All American Homes, Sierra Builders".

noting that the contract does not mention All American, and that it should control plaintiff's rights and remedies in this transaction. This argument overlooks the fact that privity of contract is not required for Consumer Protection Act claims, and that oral misrepresentations which induce a written contract may form the basis for a Consumer Protection Act claim, regardless of the language of the subsequent written contract. *See Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911 (Tenn. Ct. App. 2000); *Adkinson v. Harpeth Ford-Mercury, Inc.*, 1991 WL 17177 (Tenn. Ct. App. Feb. 15, 1991). There is simply no basis for failing to find a violation of the TCPA under the facts and circumstances of this case.

The Trial Court also based its ruling on a finding of vicarious liability/agency, which the majority concludes was incorrect. All American asserted that there was no agency relationship because the contract which it had with Sierra stated explicitly that neither party was an agent for the other. All American asserted that Sierra was an independent contractor who merely bought products from All American. All American then relied upon several cases which discuss the distinctions between an employer/employee relationship versus an independent contractor, but those are not really applicable here, since All American was clearly not Medlin's employer in the typical sense.

What must be considered, however, is whether Sierra was an agent or apparent agent of All American, based on the facts proven. As this Court has previously recognized:

> Apparent agency is essentially agency by estoppel; its creation and existence depend upon such conduct by the apparent principal as will preclude him from denying another's agency. Generally, to prove apparent agency one must establish (1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment. *England v. Select Sires, Inc.*, 1998 WL 313704 (Tenn. Ct. App. June 12, 1998)(citations omitted).

In *England*, the court discussed agency and violations of the Consumer Protection Act, and the facts are similar to the case at bar. The *England* plaintiffs were cattle farmers who were members of the Tennessee Artificial Breeding Association, and who utilized the services of a Mr. Liggett, who was employed by the Giles County Artificial Breeding Association (and then later worked as an independent contractor) as a technician who artificially impregnated cattle with semen purchased from the TABA. Mr. Liggett was TABA's customer, and he in turn used the semen he purchased from TABA to artificially inseminate cows for cattle farmers, and he earned a profit on that semen as well as a fee for his services.

Mr. Liggett was provided with "breeding receipts" for his use which were printed and furnished by TABA, and which contained the name "Select Sires, Inc.", which was a TABA trade name, and which also stated that the technician was authorized to issue the receipt as evidence of services rendered and to identify the semen used. Mr. Liggett was caught defrauding his customers, the cattle farmers, by accepting payment for higher-priced semen while inseminating their cows with a lower-priced semen.

The cattle farmers sued Liggett and TABA, and asserted, among other claims, that

TABA should be held liable for Liggett's conduct under the Consumer Protection Act, under agency principles. This Court found that agency principles did apply to the Consumer Protection Act, and that TABA negligently acquiesced in Liggett's exercise of authority for TABA by allowing its name to be printed on the breeding receipts, by providing Liggett with promotional materials which allowed the farmers to choose the semen they wanted, and because the customers testified that they believed Liggett and TABA were "one and the same." This Court found that the customers relied upon Liggett's apparent authority to their detriment, and reversed the Trial Court's dismissal of their CPA claims.

Similarly here, All American published brochures with their name and detailed information about their homes, and furnished those brochures to Sierra for use in promoting their homes. The sign at Sierra's office boldly displayed All American Homes' name and subordinated Sierra's, and the All American salesman was found to be at that office every time plaintiff visited. More importantly, as mentioned in detail above, the All American salesman encouraged plaintiff to visit the factory, to tour completed homes there, and represented to plaintiff that her home would be similarly finished out. Plaintiff was allowed to select items while at the factory, and to incorporate that into the home she contracted for - she even completed the contract with the All American salesman present. As plaintiff testified, she had no reason to think that All American and Sierra were two separate entities, and she did in fact believe that All American would stand behind her project until it was completed to her satisfaction, as that is what she was told by Mr. Groshan. Thus, it would appear that the Trial Court properly relied upon agency principles in holding All American liable for plaintiff's CPA claims.

## CONCLUSION

The Trial Court properly found All American to be liable to plaintiff under the Consumer Protection Act, and the court's judgment should be affirmed.

_____
HERSCHEL PICKENS FRANKS, P.J.

-5-